**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAUSAU BUSINESS INSURANCE COMPANY, a Wisconsin corporation, | ) ) ) ) | Case No. 1:07-cv-03732 |
| Plaintiff, | ) ) | Hon. Matthew F. Kennelly |
| v. | ) ) | Magistrate Judge Valdez |
| FISHER PRINTING CO., INC. an Illinois corporation, | ) ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

**FISHER PRINTING'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO
CROSS-MOTION FOR SUMMARY JUDGMENT OF WAUSAU**

**I.  INTRODUCTION**

As noted in Fisher Printing's opening memorandum ("Opening Memorandum"), Wausau raised four policy exclusions as grounds for its refusal to defend Fisher in the *Ashley* lawsuit – the Knowing Violation, Prior Publication, Infringement and Media Insured exclusions.  Fisher Printing argued in its Opening Memorandum that none of the four exclusions comes even close to applying, especially when considering the duty to defend, and further argued that Wausau's abandonment of its insured was in bad faith under Illinois Insurance Code Section 155.

In its response memorandum ("Response Memorandum"), Wausau offers not a single word of response to Fisher's contention that the Infringement and Media Insured exclusions do not apply.  Nor can it:  as the underlying alleged violations by Fisher arise out of Fisher's own advertisements, and as Fisher is alleged to be a printing company and not in the media business, neither exclusion could ever apply here.  Yet Wausau

frivolously asserted both exclusions and Fisher Printing was put to the expense of proving the obvious.

Wausau continues to frivolously assert the applicability of the Prior Publication and Knowing Violation exclusions. With regard to the Prior Publication exclusion, Wausau relies on a case – *Taco Bell Corp. v. Continental Cas. Co.*, 388 F. 3d 1069 (7th Cir. 2004) – which construed an identical exclusion *and affirmed the insurer's duty to defend on facts that were significantly more favorable to the insurer than those presented here*. With regard to the Knowing Violation exclusion, Wausau cites to numerous factual assertions in the underlying *Ashley* Complaint in an attempt to show that Fisher "must have known" its actions would violate Ashley's rights. Yet the very passages cited – in many cases both bolded and italicized by Wausau – lead to precisely the opposite conclusion, and Ashley itself pleads alternative, unintentional conduct on Fisher's part.

Wausau's position turns Illinois law on its head. Fisher Printing is entitled to recover both the attorneys' fees and settlement it incurred in the underlying *Ashley* lawsuit, and, because of Wausau's bad faith, its fees in this action.

## II. ARGUMENT

### A. The Prior Publication Exclusion Clearly Does Not Apply

The Prior Publication exclusion says that the Wausau Policy does not apply to:

"Personal and Advertising Injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

*See* par. 40 of SOF of Fisher, filed along with the Opening Memorandum, and Opening Memorandum, p. 10. The exclusion, applied in the context of evaluating the duty to defend, requires Wausau to examine the allegations of the *Ashley* Complaint and

determine the alleged date of "first publication" of the various "material" placed at issue. To the extent any of the material at issue was first published after the inception of the Wausau Policy, i.e. after October 31, 2006, then at least a portion of the *Ashley* Complaint is within coverage and Wausau's duty to defend is triggered.

Wausau has no argument based on the Prior Publication exclusion. Even if the *Ashley* Complaint is deemed to encompass some "publication" of some "material" by Fisher Printing prior to the October 31, 2006 inception of the Wausau Policy, this does not negate the fact that, according to the plain allegations of the *Ashley* Complaint, significant amounts of material were first published by Fisher *only after* the October 31, 2006 inception date, triggering Wausau's duty to defend. For example, Ashley's own copyright applications – attached to and incorporated by reference into the *Ashley* Complaint – show that *Ashley itself* did not "first publish" the material associated with the Durapella Cocoa application until March, 2007, well after the Wausau Policy's October 31, 2006 inception. The same holds true with respect to the Roarke-Masai and Ashley HomeStores Masthead copyright applications – with respect to both, Ashley's own date of first publication is shown in the copyright applications to be January, 2007, again, well after the Wausau Policy's inception. And the copyright applications for Glen Eagle, Casa Mollino, Cedar Heights and Sabrina Throws show a date of first publication by Ashley of October, 2006 – essentially contemporaneous with the inception of the Wausau Policy, making it very unlikely that Fisher Printing could have made any offending publication prior to the Wausau Policy's inception. *See* SOF, par. 24-27.

In short, it is clear from the *Ashley* Complaint itself that a significant portion of the material embraced by the complaint was not first published *even by Ashley* until after

the Wausau Policy's October 31, 2006 inception date. *Ipso facto* Fisher could not have made an offending publication of that material until after the October 31, 2006 inception date of the Wausau Policy and Wausau could not rely on the Prior Publication exclusion to avoid its duty to defend.

Looking for excuses, Wausau tries in vain to conflate a variety of *separate* publications of *separate* material described in the *Ashley* Complaint, and then contends that the "first publication" of this amorphous mass was prior to the October 31, 2006 inception of the Wausau Policy, thus defeating coverage. This Wausau cannot do, as shown decisively by the very case – *Taco Bell Corp. v. Continental Cas. Co.*, 388 F. 3d 1069 (7th Cir. 2004) – cited by Wausau in its Response Memorandum.

In *Taco Bell*, the Seventh Circuit was faced with a Prior Publication exclusion identical to the one in issue here. In that case a company known as Wrench LLC alleged that it developed an advertising concept, centered around the image of a "Psycho Chihuahua," which "involved the image of a clever, feisty Chihuahua dog with an attitude," the idea being "to use the humor of seeing a small dog character with a big dog's attitude." Wrench allegedly proposed to Taco Bell an advertising campaign "based on a Chihuahua with an attitude obsessed with Taco Bell food, describing the Chihuahua to be used in the campaign as edgy and feisty, with a spicy Mexican personality and an insatiable craving for Taco Bell food." *Id.* at 1072.

Wrench alleged that, beginning in the summer of 1997, Taco Bell, without the permission of Wrench, began running television commercials on the theme of "a Chihuahua obsessed with the thought of Taco Bell food to the exclusion of anything else, including a female Chihuahua." The next year, Taco Bell allegedly based its entire

national advertising campaign on "the same basic idea of a Chihuahua with an attitude that is obsessed with Taco Bell food." Wrench alleged that, as part of this campaign, Taco Bell used numerous other ideas developed by Wrench, including but not limited to the idea of a Chihuahua popping its head out through a hole at the end of a commercial. Based on these assertions Wrench sued Taco Bell for common law misappropriation under Michigan law. *Id.*

Taco Bell tendered the defense of the misappropriation lawsuit to Zurich. Zurich disclaimed coverage based on the Prior Publication exclusion, contending that, as the first "Chihuahua" ad ran before the coverage under Zurich's policy began, Taco Bell's entire Chihuahua-based advertising campaign, most of which occurred later, had been first published before the policy took effect, so that the Prior Publication exclusion applied.

The District Court disagreed with Zurich and the Seventh Circuit unanimously affirmed. In writing for the Court, Justice Posner noted that the later commercials run by Taco Bell (after the inception of the Zurich policy) appropriated not only the "basic idea" of the "Psycho Chihuahua," but other ideas as well that are protected under Michigan's common law of misappropriation, "like the idea of the Chihuahua's poking its head through a hole at the end of the commercial." As Justice Posner noted, "this is a modest idea. Who knows whether it's really protected by Michigan law . . . yet not preempted by federal copyright law. But that is not the issue. The charge of misappropriation of the idea of the Chihuahua's head popping out of a hole is a *claim* of advertising injury, meritorious or not; and Taco Bell bought insurance against having to pay the entire expense of defending against such claims." *Id.* at 1073. (Emphasis in the original.)

The Court did observe that "at some point the difference between the republished version of an unlawful work and the original would be so slight as to be immaterial," but noted that this observation *"cannot save the insurer when the republication contains new matter that the plaintiff in the liability suit against the insured alleges as fresh wrongs."* *Id.* (Emphasis supplied.) Significantly, the Court also noted that *"the only thing that gives the slightest color to Zurich's invocation of the 'prior publication' exclusion is a certain vagueness in the misappropriation tort compared to copyright infringement. The copyright infringer copies an expressive work (or a significant part of it) that is 'fixed in any tangible medium of expression,' . . . and that therefore has pretty definite metes and bounds."* *Id.* at 1073-74. (Emphasis supplied.)

Applying *Taco Bell* in the present case, it is clear that Wausau lacks even a shred of an argument for the application of the Prior Publication exclusion here. In this case, just as in *Taco Bell*, the underlying complaint alleges "new matter," published after the inception of the liability policy, that the plaintiff alleges as "fresh wrongs." Specifically, as noted above, the *Ashley* Complaint asserts that Defendant's 2007 Advertisement and Defendant's 2007 Circulars included copyrighted material that was not "first published," *even by Ashley*, until after the October 31, 2006 inception of the Wausau Policy. *Ipso facto*, this material could not have been first published by Fisher until after the October 31, 2006 inception of the Wausau Policy.

Indeed, the facts of the instant case are much stronger for the insured than were the facts of *Taco Bell*. In *Taco Bell*, as Justice Posner observed, because the intellectual property in issue was not copyrighted its definition was somewhat amorphous and Zurich could try to blur the line between the original concept of a "Psycho Chihuahua" and the

later idea (for example) of having that Chihuahua poke his head through a hole at the end of a commercial. Here, in contrast, the intellectual property in issue *is copyrighted*, and as such has definite "metes and bounds" delineating exactly what the property is and when it was first published. For example, Ashley's Durapella Cocoa, Roarke-Masai and Ashley HomeStores Masthead are very specifically identified as separate, distinct intellectual property in Ashley's copyright applications attached to the *Ashley* Complaint, and it is clear from those applications that this property was not first published *even by Ashley* until well after the October 31, 2006 inception of the Wausau Policy. In *Taco Bell* the Seventh Circuit noted that "the only thing that gives the slightest color to Zurich's invocation of the 'prior publication' exclusion is a certain vagueness in the misappropriation tort compared to copyright infringement." *Id*. at 1073. The instant case presents no such vagary: the *Ashley* Complaint asserts copyright infringement and clearly and unambiguously alleges publications of new material by Fisher Printing after the October 31, 2006 inception of the Wausau Policy. Wausau never had any right to rely on the Prior Publication exclusion to avoid its duty to defend in this case.

### B. The Knowing Violation Exclusion Clearly Does Not Apply

#### 1. Summary

The Knowing Violation exclusion says that the Wausau Policy does not apply to:

> "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

*See* SOF par. 40. As Fisher Printing noted in its Opening Memorandum, the *Ashley* Complaint is devoid of allegations supporting the inference that Fisher knew its use of the materials in question would inflict "personal or advertising injury" on Ashley, which

was not even a marketplace competitor of Fisher (Ashley makes furniture; Fisher Printing prints). Moreover, as set forth in the Opening Memorandum and explained in more detail below, the *Ashley* Complaint is replete with allegations that permit the inference that Fisher believed it had every right to do business directly with the independently owned and operated Ashley Furniture HomeStores, and utilize Ashley materials, notwithstanding the protests of Ashley.

### 2. Preliminary Statement Concerning the Various Ashley Entities

In order to understand the correspondence back and forth between Ashley and Fisher Printing, which is attached to the *Ashley* Complaint, it is important to differentiate among the various Ashley entities being referred to. Ashley Furniture, Inc. and Ashley HomeStores Ltd. (collectively "Ashley") between them allegedly own and/or control the trademarks and copyrights at issue in the *Ashley* Complaint. *See* the *Ashley* Complaint, Exhibit B to Wausau Complaint (Baker Affidavit, Exhibit 1), at par. 3, 4, 8-11, 51 and 61. Ashley, in turn, *sub-licenses* the Ashley trademarks to independently owned and operated Ashley Furniture HomeStores. See *Ashley* Complaint at par. 8-11. Thus Ashley (i.e. Ashley Furniture, Inc. plus Ashley HomeStores Ltd.) acts, in effect, as "franchisor," and the independently owned and operated Ashley Furniture HomeStores act, in effect, as "franchisees."

As shown below, with these corporate distinctions in mind it was clearly permissible to infer from the *Ashley* Complaint that Fisher Printing believed it was well within its rights in using Ashley marks and copyrighted materials when marketing its printing services to the Ashley Furniture HomeStores franchisees (and elsewhere), thus defeating any inference that Fisher knowingly violated Ashley's rights.

### 3. Discussion

In the Opening Memorandum, Fisher noted, by way of example, the February 24, 2006 e-mail from Chris Fischer of Fisher Printing to Ashley, in which Chris Fisher notes that Fisher Printing was being "asked to provide design and printing services by . . . independently owned and operated Ashley Furniture Home Stores," and that "I'm sure you are aware that not all of the Ashley Furniture Home Stores are placing print orders from your [Ashley's] program, many have secured sources out side of the program and are negotiating independently." *See* SOF par, 33. This clearly speaks to a belief on Chris Fischer's part that Fisher Printing's marketing activities with the independent Ashley Furniture HomeStores franchisees was permissible, appropriate and certainly not harmful to any "rights" of Ashley.

The passages from the *Ashley* Complaint cited by Wausau in its Response Memorandum further support the inference that Fisher Printing did not believe – and certainly did not say it believed – that it was working any harm on Ashley by creating mocked up advertising circulars for the independent Ashley Furniture HomeStores franchisees. In fact, Fisher's communications show that it did not believe Ashley really had the rights it claimed to have in connection with the material in question. While Ashley *took the position* that Fisher was violating its rights, Fisher Printing did not agree.

Thus in the February 24, 2006 correspondence described above, Chris Fischer not only noted that "I'm sure you are aware that not all of the Ashley Furniture Home Stores are placing print orders from your [Ashley's] program, many have secured sources out side of the program and are negotiating independently," he also noted that Fisher Printing had been "*asked to provide* design and printing services by those independently owned

and operated Ashley Furniture Home Stores." (Emphasis supplied.) Fischer goes on to state – as quoted by Wausau – that Fisher Printing would not place the Ashley mark on "any out going proofs or mocked up sample circulars before requesting and receiving written authorization *from our [Ashley Furniture HomeStores] customers*." (Emphasis supplied.) This "concession" by Chris Fischer was no concession whatsoever: all Fischer is saying in his e-mail to Ashley is that Fisher Printing will refrain from using the Ashley marks without first receiving permission from its "*customers*," i.e. the independently owned and operated *Ashley Furniture HomeStores franchisees*. Fischer is *not* agreeing to seek the permission of Ashley – the franchisor – to use Ashley marks, and Fisher Printing plainly did not believe it needed permission from Ashley to do business directly with the Ashley Furniture HomeStores franchisees. Indeed, Chris Fischer ends his e-mail to Ashley by stating that "Fisher Printing will continue to call the [Ashley Furniture HomeStores] and offer our products and services."

The March 6, 2006 responsive correspondence from Ashley's counsel to Chris Fischer – quoted by Wausau at pp. 6-7 of its Response Memorandum – only further reinforces the inference that Fisher Printing was within its rights, and certainly was entitled to believe it was within its rights, in using Ashley marks to market its printing services, without the "permission" of Ashley. In this March 6, 2006 letter, counsel expresses Ashley's appreciation of Fisher Printing's "agreement not to put the Ashley Furniture HomeStore logo or other registered trademarks . . . on any of your advertising proofs and mocked up advertising circulars *before requesting and receiving written authorization*." (Emphasis supplied.) The "written authorization" that Ashley's counsel is referring to is the authorization of the *Ashley Furniture HomeStores franchisees*, i.e.

Fisher Printing's *own customers*, since this is what Chris Fischer agreed to in his February 24, 2006 e-mail. *Thus Ashley's counsel is implicitly acknowledging that the "permission" needed by Fisher Printing is **not** that of Ashley.* (Again, Ashley's counsel does not represent the Ashley Furniture HomeStores franchisees; at the top of his letter he says that he represents Ashley HomeStores Ltd., which, along with Ashley Furniture, Inc., is the franchisor.)

Indeed, in this same March 6, 2006 correspondence – again quoted by Wausau – Ashley's counsel expressly notes that "while each independently owned and operated Ashley Furniture HomeStore retail furniture store determines which advertising vendors to work with, the *licensee* must abide by the terms and conditions of the license agreement with the HomeStores [i.e. Ashley HomeStores Ltd., the franchisor]. Please be advised that pursuant to that license agreement, each *licensee* must obtain written approval of any advertisements that contain one or more of the Marks." (Emphasis supplied.) "Licensee" as used in this March 6, 2006 letter, clearly means the Ashley Furniture HomeStores franchisees (as sub-licensees as pled in paragraph 11 of the *Ashley* Complaint). *See* Wausau SOAF par. 4. "Licensee" most certainly *does not* refer to Fisher Printing. In other words, counsel to Ashley is telling Chris Fischer in this March 6 letter *not* that *Fisher Printing* will run afoul of Ashley Furniture by using Ashley marks, but that Ashley's *licensees* – the Ashley Furniture HomeStores franchisees, i.e. Fisher Printing's *customers* – may run afoul of Ashley.

Thus the allegations of the *Ashley* Complaint permit the inference that Fisher Printing was looking upon the argument over the use of Ashley marks as an "intra-family" corporate dispute between Ashley, as franchisor, and the Ashley Furniture

HomeStores franchisees, and that Fisher Printing proceeded to use the Ashley marks and copyrighted materials under the sincere – and quite probably correct – belief that it was entitled to do so. At the very least, given the nature of the correspondence back and forth between Fisher Printing and Ashley and its counsel, it is a permissible inference that Fisher Printing was unclear about its rights or believed that Ashley was simply blowing smoke. For Wausau to suggest that the "only" possible inference that can be drawn from the allegations of the *Ashley* Complaint is that Fisher Printing knowingly harmed Ashley – which is what it must prove in order to avoid its duty to defend – is ludicrous to the point of frivolity. If anything, the pleaded facts more strongly support the opposite conclusion.

Beyond this, as noted in the Opening Memorandum, *not even Ashley* asserts that Fisher Printing acted with knowledge that its actions would harm Ashley. The First and Third Claims of the *Ashley* Complaint assert *both* intentional *and* reckless conduct by Fisher Printing, and the Second Claim pleads in the alternative *either* intentional *or* reckless conduct by Fisher Printing. Again, allegations of "reckless disregard" are not allegations of "knowledge" under personal injury exclusions. *St. Paul Ins. Co. of Ill. V. Landau, Omahana & Kopka, Ltd.,* 246 Ill. App. 3d 852, 619 N.E. 2d 1266 (1st Dist. 1993). It is ironic that, even where Fisher Printing's litigation adversary does not insist in its pleading that Fisher Printing committed a knowing violation, *Fisher Printing's own liability insurer does*. Instead of discharging its duty to defend, Wausau bends over backwards in search of any inference that will take it off the hook. This is exactly the opposite of what is required of Wausau under Illinois law.

### C. Wausau's Refusal to Defend Fisher Printing Violated Section 155

Wausau's bad faith could not be clearer. As Wausau itself notes in its Response Memorandum, under Illinois law the existence of a *bona fide* coverage dispute forbids a finding that an insurer's denial of coverage was vexatious and unreasonable. Fair enough, but the corollary also holds true: an insurer that disclaims coverage without any reasonable basis can be found to have acted vexatiously and unreasonably under Illinois Insurance Code Section 155. *Matsushita Elec. Corp. of America v. Home Indem. Co.*, 907 F. Supp. 1193 (N.D. Ill. 1995).

In the present case, Wausau never had any grounds to avoid its defense obligation to Fisher Printing based on the *Ashley* Complaint. As noted above, Wausau's coverage "defenses" based on the Infringement and Media Insured exclusions, which Wausau raised both in pre-litigation correspondence and in this coverage litigation, have now been dropped by Wausau without any argument and without so much as a single word of explanation. The reason is simple: these exclusions never applied and never had the slightest chance of applying. Wausau raised these exclusions vexatiously and unreasonably. Fisher Printing, which is dwarfed in size by Wausau, was then put to the expense of proving the obvious. Wausau violated Section 155.

With regard to the Prior Publication exclusion Wausau's position is similarly frivolous. Looking to the *Ashley* Complaint, Wausau knew from the beginning that substantial amounts of the copyrighted material were not first published, *even by Ashley*, until after the October 31, 2006 inception of the Wausau Policy, yet still invoked the Prior Publication exclusion and refused to defend. Wausau's abandonment of Fisher

Printing would have been bad enough had it taken place before the Seventh Circuit decided *Taco Bell*. For Wausau to invoke the Prior Publication exclusion, on the facts of this case, *after* the decision in *Taco Bell*, is indefensible. As Justice Posner observed in *Taco Bell, "the only thing that gives the slightest color to Zurich's invocation of the 'prior publication' exclusion is a certain vagueness in the misappropriation tort compared to copyright infringement.*" *Id.* at 1073-74. (Emphasis supplied.) Here, Wausau was faced with a copyright infringement case, and knew from the face of the *Ashley* Complaint that copyrighted material was allegedly first published after the inception of its policy. Yet Wausau still refused to defend. This was a clear violation of Section 155.

With regard to the Knowing Violation exclusion, Wausau is apparently capable of: (1) reading, quoting, bolding and italicizing long passages from the *Ashley* Complaint that clearly support an inference of unknowing and unintentional violation (if there even was a violation) of Ashley's "rights" by Fisher Printing; and (2) nonetheless asserting that the only permissible inference to be drawn from the *Ashley* Complaint is that Fisher Printing "must have known" it was both violating Ashley's rights and harming Ashley. This is shameful enough, and in complete contravention of Illinois law, but is made even worse by the fact that *even Ashley* – Fisher Printing's litigation adversary – pleads the possibility that Fisher Printing's conduct was unknowing and unintentional. Wausau, on the other hand, is blind to any inference in the *Ashley* Complaint that leads anywhere but to a denial of coverage for Fisher Printing. Wausau should face Section 155 liability.

Finally, Wausau seems to think it is insulated from Section 155 liability by virtue of promptly filing a declaratory judgment action in which it remains true to its completely

unfounded coverage position. Wausau is wrong. Under Illinois law, the prompt filing of a declaratory judgment action by an insurer will avoid the insurer being estopped from raising coverage defenses. *L.A. Connection v. Penn-America Ins. Co.*, 363 Ill. App, 3d 259, 843 N.E. 2d 427, 430 (Ill. App. 3rd Dist 2006). *But this has nothing to do with Section 155 liability.* Under Section 155, in fact, the pendency of a declaratory judgment action is an exacerbating circumstance, not a mitigating circumstance, in analyzing an insurer's exposure, because it forces the insured to incur legal fees to establish coverage under the policy. *Mobil Oil Corp. v. Maryland Cas. Co.,* 288 Ill. App. 3d 743, 681 N.E. 2d 552 (1st Dist. 1997). In most cases, to be sure, the pendency of a coverage action suggests the existence of the sort of *bona fide* coverage dispute that insulates the insurer from Section 155 liability. But where, as here, the coverage action filed by the insurer is as bogus as the underlying "dispute," that coverage action will not save the insurer and is, in fact, just an additional instance of the insurer's bad faith.

### III. CONCLUSION

For the foregoing reasons, Fisher Printing's motion for summary judgment should be granted and Wausau's cross-motion for summary judgment should be denied.

Respectfully submitted,

Dated:     April 22, 2008

/s/ Robert B. Baker
Robert B. Baker
**SURDYK & BAKER**
225 West Washington Street, Suite 2200
Chicago, Illinois 60606
(312) 924-2818
Facsimile: (312) 924-2867
rbaker@sbchicago-law.com

**ATTORNEYS FOR FISHER PRINTING CO., INC.**

CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing FISHER PRINTING'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT OF WAUSAU was served upon all counsel of record, before the hour of 5:00 p.m. on the 22nd day of April, 2008, via electronic mail.

/s/Robert B. Baker_____